Filed 8/9/22  In re J.L. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | C094424 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.L.,<br><br>Defendant and Appellant. | (Super. Ct. No. JJCJVDE20190000801) |

This appeal is from a juvenile court's dispositional order committing J.L. (minor), born in February 2005, to the Division of Juvenile Justice (DJJ) following his admission to several felonies.  On appeal, the minor argues his commitment to DJJ was an abuse of the juvenile court's discretion because there was a lack of evidence the commitment was

1

beneficial, and he had presented uncontroverted evidence commitment to DJJ would adversely affect him because of its impending closure.  We affirm.

## I.  BACKGROUND

This case involves three sets of petitions filed under Welfare and Institutions Code section 602 against the minor over two years.[1]

*A.*     *First Set of Petitions*

In June and July 2019, the minor was charged with 10 separate felonies, in three petitions, based on three separate incidents.  On August 20, 2019, at the contested jurisdictional hearing, the minor admitted four counts from the three petitions:  willful discharge of a firearm in a grossly negligent manner (Pen. Code, § 246.3, subd. (a)), carrying a loaded firearm (Pen. Code, § 25850, subd. (c)(2)), grand theft of a person (Pen. Code, § 487, subd. (c)), and false imprisonment (Pen. Code, § 236).  The remaining counts were dismissed.

The factual basis for the admissions, as agreed to on the record at the jurisdictional hearing, described the three events leading to the petitions.  On March 16, 2019, the minor had a concealed firearm, "and while handling the firearm, the minor . . . shot himself in the thigh."  On July 3, the minor and several others entered a home with "A.R. styled rifles."  They ordered one victim to lay on the floor, asked this victim where firearms were in the house, and punched the victim when the victim did not tell them.  They then rummaged through the house finding "a number of firearms that belonged to the victims."  Two other victims came home during the incident and "were ordered inside of the house at gunpoint and also ordered to lay on the floor near the first victim."  The minor and the others eventually left with the stolen firearms.  Finally, for the third incident, the minor was in a car stopped by police, and during a search, "a firearm was

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

2

located near the minor and it was later determined to be one of the firearms that was stolen" during the prior incident.

On September 18, 2019, the minor was declared a ward of the juvenile court. Instead of committing the minor to the San Joaquin County probation camp program, as probation recommended and the People argued for, the juvenile court sentenced the minor to 300 days in juvenile hall with a maximum period of confinement of five years.

At a status hearing on December 18, 2019, the probation officer reported the minor "had seven write-ups for disobedience, two write-ups for group disturbances, and two write-ups for contraband," summarizing his performance as "mixed. Not great. Not horrible, but he could do better." The minor was released to his parents on March 18, 2020.

## B. Second Set of Petitions

After the minor's release, two notices of probation violations were filed in April and May 2020, and then another petition was filed on May 29, 2020. This petition alleged five felonies, along with several enhancements. On June 18, 2020, the minor admitted to a charge of carjacking. (Pen. Code, § 215, subd. (a).) The remaining charges were dismissed and the violations of probations were discharged.

The parties stipulated to the police report for the factual basis of the admission. This report stated that on April 8, 2020, the victim was working on his car when three males drove up and asked him if he wanted to buy firearms. The males then threatened him with guns, one punched him in the face, and they then drove off with his car. The victim identified the minor as the driver of the first car and "who pointed the gun at him saying 'get out.' " The minor admitted to police he was present during the carjacking.

At the disposition hearing on July 2, 2020, the juvenile court adopted the probation department's recommendation and committed the minor to the probation camp with a maximum period of confinement of 12 years. The minor was released on December 17, 2020, through the camp's aftercare program.

*C.     Third Set of Petitions*

After the minor's second release, an additional five petitions were filed between February and April 2021, collectively alleging two probation violations and 12 felonies, along with several enhancements, related to events both in and out of custody.

On April 9, 2021, the minor admitted three charges: carrying a loaded firearm (Pen. Code, § 25850, subd. (c)(2)), battery resulting in great bodily injury (Pen. Code, § 243, subd. (d)), and assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)).  All remaining charges and enhancements were dismissed, and the probation violations were discharged.

The parties stipulated to probation reports as the factual basis for the admissions. These reports show that on February 9 and 10, 2021, the minor posted to his social media account videos and pictures of him holding and displaying firearms.  During a probation search at the minor's house on February 10, the minor was found outside of the house next to a car with several firearms inside; the minor was booked into juvenile hall.  On March 2, the minor participated with several others in an attack of two other minors in juvenile hall.  And on March 23, the minor got involved in a fight between two youths at juvenile hall and disregarded a detention officer's order to stop and get on the ground.

*D.     Final Disposition*

*1.     Probation Report*

The probation report prepared for disposition acknowledged the minor "has had some successes on Probation including, completing the Electronic Monitoring Program on two occasions and CAMP program."  But the minor also "does not appear to respect authority figures and fails to follow the directives of the Court, along with obeying his parents.  [The minor] is able to distinguish the difference between what is right and wrong, but plays the victim when approached about his actions and tends to blame it on others and the environment he is in."  The report recommended a commitment to DJJ because the minor "would benefit from a more structured environment that provides

4

opportunities to further his education and programming. . . . [¶] The [DJJ] provides treatment programs that address violent and criminal behavior, substance abuse, and mental health problems all while maintaining a safe and secure environment. Further, DJJ offers [the minor] to continue their education including completing college courses and a variety of vocational programs."

2.     *Testimony*

Over several days in June 2021, the juvenile court held the contested dispositional hearing with three witnesses testifying.

Dr. Carolyn Murphy, a forensic psychologist, testified based on her interview of the minor in May 2021, interview of family members, and a review of the minor's records. The minor disclosed to her he was the victim of "pretty significant sexual abuse," he had been struggling with depression, and he had substance abuse issues. In a review of his school records, she found his defiance in school "appear[ed] to correspond with the disclosed onset of some sexual abuse." There were also mental health issues in the minor's family and the minor disclosed to her that when he shot himself in the leg, he was "suicidal," "[h]e was wanting to kill himself and then accidentally shot himself." The minor also disclosed more significant substance use than she believed the minor disclosed to probation. The minor used alcohol, cannabis, and cocaine starting as an early teen, and his use would come in waves—using heavily and then stopping for a little while.

Dr. Murphy suggested that to help the minor, he needed to be in an "environment where sobriety [wa]s assured. . . . [T]hen you want to do concurrent substance abuse treatment, address his past history of abuse, address his behavioral issues and coping skill deficits. . . . [¶] So the short answer is, psychotherapy or counseling, psycho-education, you know, skill building, substance abuse treatment, and enforced sobriety. . . . [¶] So you also want to help him finish his education, look at vocational training, a sense of

5

purpose and identity, parenting skills, hobbies and interests, with the idea in mind that you want to beef up his prosocial skills and address unmet needs."

As for placement, Dr. Murphy testified there were alternatives to DJJ that could better meet the minor's needs, but she could not provide specific locations or placements. She also agreed it could be detrimental for the minor's treatment to be disrupted because, "given his particular issues, and I'm talking specifically to the sexual abuse, there's going to need to be a lot of trust. Fewer people to reveal some of these things and not have to retell his story over and over again. So I think considering a program that's got less staff turnover—I haven't thought of this before, but that would probably be an important thing to look at in terms of selecting location." But she also agreed DJJ could help the minor's substance abuse goal of creating a period of sustained and secured abstinence.

The defense also called probation officer Ken Chiong to testify, who was the supervisor for the juvenile probation camp. The camp was in the process of transitioning to providing services only to minors that have been committed to over 30 days in juvenile hall. When asked if the camp is ready to reaccept youths, Officer Chiong said it depends on the case, as decided by their behavioral management committee. He said the minor had been at the camp before, and they "never had any issues with him. He actually did real well and stuff. So it's all what the committee would agree on, depending on a case-by-case thing." When asked if he thought the minor would be a good candidate for the camp's new program, Officer Chiong said: "In a sense. He was successful previously. Like I said, behavior-wise and stuff, he was respectful to staff. He really didn't give us any problems like that."

Finally, Officer Kristin Crenshaw testified she worked at juvenile hall and had seen the minor a couple of times there and at the camp over the last two and a half years. She said she had seen changes in him, he had been working on his anger and had gotten a lot better at following directives, saying when she told "him something, it's only one time and he corrects his behavior." She felt DJJ wasn't a good setting for the minor,

explaining she believed he would benefit from being away from peer pressure and would do better "in a smaller setting and if he is able to be around his family, positive influences." Officer Crenshaw acknowledged the minor had 11 issues in six weeks in juvenile hall: He was written up for six disobediences, had been in two fights, had stolen property, and was twice found in possession of contraband. But, she said, this was the result of peer pressure and needing to show off to "fit in or to look cool."

       3.      *Documentary Evidence*

The prosecutor entered into evidence DJJ program fact sheets. The fact sheet on the available mental health treatment programs states, in part: "DJJ Mental Health Services provide an evidence-based continuum of care based on the Principles of Effective Interventions. The standardized curriculum provides participating youth with education, interventions, and exercises to assist them in stabilizing their mental health symptoms, increase pro-social decision-making, and reduce criminogenic risk factors. [¶] These mental health interventions include Trauma-Focused Cognitive Behavioral Treatment (TF-CBT), psychopharmacological services, and specific interventions for diagnoses extracted from existing research. Mental Health Services uses an interdisciplinary and collaborative treatment approach with youth and staff to develop objective individual treatment plans to stabilize mental health symptoms, as well as, target dynamic risk factors that contribute to re-offense." This fact sheet also provided information on specific mental health programs, mental health facilities, and staffing.

The packet also provided information on intervention strategy programs, including "Cognitive Behavioral Interventions for Substance Abuse." This program "is a 39-session curriculum designed for individuals who are moderate to high need in the area of substance abuse. . . . This intervention relies on a cognitive behavioral approach to teach participants strategies for avoiding substance abuse." Other intervention programs include "Aggression Replacement Training," "CounterPoint"—an intervention for male offenders presenting a greater risk of re-offending—and mandatory journaling programs

"designed to respond to individual treatment needs." The packet also provided fact sheets on DJJ's education services, including career technical education, and its re-entry program.

The parties also entered a stipulation to admit evidence regarding juvenile justice realignment after recent legislation. This included statements from the Department of Corrections and Rehabilitation's website stating DJJ would be closed by June 30, 2023, DJJ would be closing programs over the next two years—but "[n]o one currently knows what programs are being eliminated or when"—and DJJ "will be transitioning youth at DJJ on a case-by-case basis back to their county of placement."

### 4. *Order*

On June 28, 2021, following the parties' closing arguments, the court said it considered all the arguments, "reviewed closely the exhibits," considered the probation report, and found the "recommendations of the probation department [we]re appropriate and in the minor's best interest." The court therefore committed the minor to DJJ with the maximum period of confinement of 10 years four months.

## II. DISCUSSION

The minor argues the trial court erred in committing him to DJJ and asks us to remand for the juvenile court to reconsider the appropriateness of DJJ.

### A. *Legal Standards*

A juvenile court's decision to commit a minor to DJJ " 'may be reversed on appeal only upon a showing that the court abused its discretion.' " (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1147.) This requires the commitment to be based on substantial evidence, as " ' "[a] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." ' " (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.) When reviewing a commitment for substantial evidence, we " 'must indulge all reasonable inferences to support the decision of the juvenile court,' " and "

'we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " (*In re Jose T., supra,* at p. 1147.)

As described in section 202, the purpose of juvenile delinquency law is to "provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible." (§ 202, subd. (a).) If a juvenile court determines removal of a minor is necessary, the purpose of the law is "to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents." (*Ibid*.) This requires balancing the minor's "best interest and the best interest of the public. Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." (§ 202, subd. (b).) "Juvenile courts and other public agencies charged with enforcing, interpreting, and administering the juvenile court law shall consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor in all deliberations pursuant to this chapter." (§ 202, subd. (d).)

Historically, the statutory scheme "contemplate[d] 'a progressively more restrictive and punitive series of dispositions' with DJJ 'normally a placement of last resort.' " (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 906.) To this end, no minor could be committed to DJJ unless the court was "fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by [DJJ]." (§ 734; see Cal. Rules of Court, rule 5.790(h)(3) ["[t]he decision regarding choice of placement must take into account . . . [¶] . . . [t]hat the setting is the environment best suited to meet the child's special needs and best interest"].) The evidence to support this finding must have included, at a minimum, "*brief* descriptions of

9

the relevant" DJJ programs that addressed a minor's particular needs. (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 12.) There was " 'no absolute rule that a [DJJ] commitment [could] be ordered unless less restrictive placements have been attempted.' " (*In re Calvin* (2016) 5 Cal.App.5th 522, 528.) But "there must be evidence 'supporting a determination that less restrictive alternatives are ineffective or inappropriate.' " (*In re Carlos J., supra,* at p. 6.) Thus, a DJJ commitment was " 'not an abuse of discretion where the evidence demonstrate[d] a probable benefit to the minor from the commitment and less restrictive alternatives would [have been] ineffective or inappropriate.' " (*In re Calvin, supra,* at p. 528.)

Senate Bill No. 823 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 337), passed in 2020, and Senate Bill No. 92 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 10), passed in 2021, significantly overhauled juvenile justice in California by shifting juvenile justice responsibility from DJJ to counties. (See Stats. 2020, ch. 337, § 1, subd. (b); 736.5, subd. (a).) DJJ is now statutorily mandated to "close on June 30, 2023," and minors shall not be committed to DJJ "[b]eginning July 1, 2021." (§ 736.5, subds. (e), (b); see § 733.1, subd. (a).) Courts may commit a minor to DJJ before July 1, 2021, and any minor committed before then "shall remain within its custody until the ward is discharged, released or otherwise moved pursuant to law, or until final closure of the [DJJ]." (§ 736.5, subd. (d); see § 733.1, subd. (b).)

B.      *Analysis*

Given the minor was committed to DJJ on June 28, 2021, the minor was not statutorily ineligible for a commitment to DJJ; the minor does not contend otherwise. Instead, the minor argues insufficient evidence supported the commitment because: (1) the probation recommendations for DJJ did not provide "brief descriptions of the relevant programs" and instead "contained a mission statement about DJJ programs as a whole"; and (2) the prosecution failed to adequately respond to the minor's evidence a DJJ placement would be harmful to him.

10

There is substantial evidence supporting the minor's commitment to DJJ here. Even though the probation report did not provide specific information on DJJ programming, the packet the prosecutor provided to the juvenile court listed numerous programs that would specifically benefit the minor. As Dr. Murphy testified, the minor needed a sober environment with substance abuse programming, mental health support to address both substance abuse and past sexual abuse, and the development of prosocial skills such as vocational training and hobbies. According to the evidence, DJJ has programs addressing each of these. It has substance abuse programs and Dr. Murphy agreed DJJ would be an appropriate sober environment. DJJ also has extensive mental health services specifically tailored to each minor's needs. And there are several educational and vocational training programs that build prosocial skills.

There is also substantial evidence a less restrictive placement would have been ineffective. Before the DJJ commitment, the minor had been placed three times in two less restrictive settings: juvenile hall twice, and the probation camp once. The minor did not perform well during and after these placements. The minor had numerous write-ups and fought at least twice in juvenile hall. After release from both placements, he almost immediately continued his criminal and dangerous behavior. Numerous least restrictive placements failed to curtail his criminal proclivity. (See *In re A.R.* (2018) 24 Cal.App.5th 1076, 1082 [finding the minor's continued criminal behavior after less restrictive placements left "little doubt that less restrictive alternatives have been wholly ineffective in rehabilitating the [m]inor"].)

The minor further contends reversal is warranted because the prosecutor failed to address his evidence commitment to DJJ would be detrimental because it is closing, and he needs consistent treatment. Initially, there was no evidence DJJ commitment would result in detrimentally inconsistent treatment. Dr. Murphy testified the minor would benefit from consistent treatment and it was stipulated DJJ is closing no later than June 30, 2023. The minor makes a leap that because DJJ must close in two years, this would

be inconsistent enough to be detrimental to the minor. There is no evidence directly supporting this conclusion.

But even if there was evidence of a potential detriment based on inconsistency, there is no legal requirement for the prosecution to rebut all evidence of potential detriment. Courts instead must be fully satisfied a DJJ commitment would be a probable benefit by weighing all of the evidence together, so conflicting evidence does not automatically warrant reversal. (*In re N.C.* (2019) 39 Cal.App.5th 81, 87 ["While we acknowledge this conflicting evidence, it does not render the juvenile court's commitment order an abuse of discretion or warrant its reversal"].) Otherwise, a court would be obligated to adopt any doctor's conclusion left unrebutted, which would undermine the court's ultimate authority in deciding whether a DJJ commitment would be a probable benefit. (Cf. *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 ["The court is not under any obligation to adopt the doctors' opinions. Such a requirement would undermine the court's role in determining a minor's competency"].) For the reasons stated above, there was substantial evidence here a DJJ commitment would benefit the minor, even if there was some conflicting evidence. (*In re N.C., supra,* at p. 87 ["our role on appeal is to determine whether the juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record"].)[2] The juvenile court therefore did not abuse its discretion.

---

[2] The minor relies on *In re Miguel C., supra*, 69 Cal.App.5th 899 for its holding: "In the event of credible opposing evidence, the People would then be obligated 'to present more indepth information about the [DJJ] in order to show probable benefit.' " (*Id*. at p. 910.) For the reasons previously discussed, we disagree with this finding to the extent it imposes a duty on prosecutors to respond to all contradicting evidence. *In re Miguel C.* derives its finding from *In re Carlos J.*, which merely provided guidance that if a minor presents evidence of a potential detriment, "it *may be necessary* for the People to provide additional information." (*In re Carlos J., supra*, 22 Cal.App.5th at p. 14, italics added.) The appellate court in *In re Carlos J.* clarified: "We make no attempt in this decision to

## III.  DISPOSITION

The dispositional order committing the minor to the Division of Juvenile Justice is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

HULL, Acting P. J.

/S/

_____

DUARTE, J.

_____

comprehensively set forth the type and quantum of information the probation department should provide, either in its initial presentation at the time of disposition or in response to any showing made by a minor raising concerns about the [DJJ]." (*Id*. at p. 14.)  The probation department and prosecutor in *In re Carlos J.* also failed to provide any "concrete evidence in the record about relevant programs at the [DJJ]." (*Id*. at p. 12.)  This is not the case here.